IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

|  |  |  |
|---|---|---|
| BOARD OF TRUSTEES, SHEET METAL WORKERS' NATIONAL PENSION FUND, | ) ) ) ) | |
| *Plaintiff,* | ) ) | |
| v. | ) ) | Civil Action No. 1:14-cv-858 |
| CADDO SHEET METAL, LLC, | ) ) | |
| *Defendant.* | ) ) ) | |

## MEMORANDUM OPINION

This matter comes before the Court on cross motions for summary judgment by Plaintiff

Board of Trustees, Sheet Metal Workers' National Pension Fund ("the Fund") (Dkt. No. 34) and

Defendant Caddo Sheet Metal, LLC ("Caddo"). Dkt. No. 31. The motions have been fully

briefed by the parties. On June 12, 2015, the Court heard oral argument and took the matter

under advisement. For the reasons set forth below, Plaintiff's motion will be denied and

Defendant's motion will be granted.

## I.    Background

This controversy arises out of a collective bargaining agreement ("CBA") between

Defendant Caddo, a small sheet metal construction business, and the local sheet metal workers'

union in Shreveport, Louisiana. Caddo is owned and operated by Shane Cates and Casey

Melton, former sheet metal workers who had been dues-paying members of the Sheet Metal

Workers' International Association. The Fund is comprised of individual trustees who are

fiduciaries with respect to the Sheet Metal Workers' National Pension Fund.

1

On or prior to July 1, 2010, Melton executed the CBA on behalf of Caddo, and Donald

LaCroix executed it on behalf of the local sheet metal workers' union, Local Union No. 361.

Pursuant to Article XVI of the CBA, the CBA term began on July 1, 2010 and expired on June

30, 2013. The CBA required Caddo to pay monthly contributions to the Fund based on the

amount of hours that its employees worked, among other obligations. The CBA also

incorporated the Fund's Trust Document. The Trust Document contains a provision entitled

"Exit Contribution and Surcharges," which states as follows:

> The Trustees [of the Fund] may, in their sole and absolute
> discretion, impose an "Exit Contribution" (as determined below)
> on any Employer who has a "Triggering Event" on or after January
> 1, 2003. . . . Each Employer agrees to pay an Exit Contribution by
> continuing to contribute, or continuing to be obligated to
> contribute, to the Fund on or after January 1, 2003. . . . A
> "Triggering Event" occurs when an Employer's Contribution
> Rate significantly declines (as determined by the Trustees) or the
> Employer ceases to have an obligation to contribute to the Fund on
> some or all of its Employees, but is not required to pay any
> withdrawal liability under Title IV of ERISA as a result thereof.

Def.'s Mem. Supp. Summ. J. ("Def.'s SJ Mot."), Ex. E ("Trust Doc."), Article V, Section 6.

According to Caddo, the Trust Document was not provided to Melton or any Caddo

representative prior to Caddo's execution of the CBA. The Fund maintains that the Trust

Document has been posted on its website at all relevant times, including during the negotiations

leading up to the CBA's execution.

On or about December 28, 2012, pursuant to its obligation under Article XVI of the

CBA, Caddo mailed a notice to the Fund of its non-renewal of the CBA. The CBA then

terminated by its terms on June 30, 2013. Sometime thereafter, the Fund concluded that "on or

about July 1, 2013," Caddo effected a "complete withdrawal" from the Fund. It therefore

determined that a "Triggering Event" under the Fund's Trust Document had occurred and

2

assessed Caddo an exit contribution in the amount of $70,413.92.  On February 21, 2014, the Fund sent Caddo a letter notifying it of this assessment.  According to Caddo, this was the first time the Trust Document had been "brought to its attention."  Def.'s Opp'n, Ex. B, Second Melton Decl. ¶ 21.  To date, Caddo has not paid the exit contribution and on July 9, 2014, the Fund filed the instant suit in this Court.  Dkt. No. 1.

## II.    Legal Standard

Because this matter comes before the Court on cross-motions for summary judgment, the Court must "review each motion separately on its own merits" and ensure that it "resolve[s] all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (citations and internal quotation marks omitted).  "One of the principle purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).  Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  As the Supreme Court has explained, "this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original).  A dispute over an issue of material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

3

## III.   Analysis

The Fund and Caddo have each moved for summary judgment on the single count of the Complaint—a claim under sections 502(g)(2) and 515 of the Employee Retirement Income Security Act of 1974 (ERISA). Dkt. Nos. 31, 34. The Court finds that resolution of the motions turns on whether Caddo's obligation to pay the exit contribution survived the expiration of the CBA.

To determine whether the exit contribution provision survived the expiration of the CBA, the Court must interpret the CBA "according to ordinary principles of contract law, at least when those principles are not inconsistent with federal labor policy."[1] *M & G Polymers USA, LLC v. Tackett*, 135 S. Ct. 926, 933 (2015). Relevant here, a "traditional principle" of contract interpretation is that "contractual obligations will cease, in the ordinary course, upon termination of the bargaining agreement." *Id.* at 937 (quoting *Litton Fin. Printing Div., a Div. of Litton Bus. Sys., Inc. v. NLRB*, 501 U.S. 190, 207 (1991)) (internal quotation marks omitted). This principle, however, "does not preclude the conclusion that the parties intended" certain rights to survive the expiration of the agreement. *Id.* Both the Fourth Circuit and the Supreme Court have recognized that such an agreement may reflect the parties' "clear intention" or "provid[e] in explicit terms that certain [provisions] continue after the agreement's expiration." *Id.* (quoting *Litton*, 501 U.S. at 207); *Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 292 (4th Cir. 2011) ("Employer obligations and employee rights, under a collective bargaining agreement, do not survive the expiration of the agreement absent a clear intention of the parties." (citation and internal quotation marks omitted)).

First, the Court must look to the contract's language, which if "clear and unambiguous, its meaning is to be ascertained in accordance with its plainly expressed intent." *M & G*

---

[1] The parties agree that, although brought under ERISA, the claim is contractual in nature.

*Polymers*, 135 S. Ct. at 933 (quoting 11 R. Lord, Williston on Contracts § 30:6, p. 108 (4th ed.

2012) (Williston)); *accord Keffer v. H.K. Porter Co.*, 872 F.2d 60, 62 (4th Cir. 1989) ("[A]s with

any contract interpretation, we begin by looking at the language of the agreement for any clear

manifestation of the parties' intent."). In this endeavor, the Fourth Circuit has instructed courts

to construe contracts as a whole "so that if possible, or so far as possible, they may all

harmonize." *Potenciano L. Aggarao, Jr. v. MOL Ship Mgmt. Co. Ltd.*, 675 F.3d 355, 368 (4th

Cir. 2012) (citation and internal quotation marks omitted); *cf. M & G Polymers*, 135 S. Ct. 926,

937–38 (Ginsburg, J., concurring) ("To determine what the contracting parties intended, a court

must examine the entire agreement in light of relevant industry-specific 'customs, practices,

usages, and terminology.'" (quoting 11 Williston § 30:4, at 55–58)). "When the intent of the

parties is unambiguously expressed in the contract, that expression controls, and the court's

inquiry should proceed no further. But when the contract is ambiguous, a court may consider

extrinsic evidence to determine the intentions of the parties." *M & G Polymers*, 135 S. Ct. 926,

938 (Ginsburg, J., concurring) (citations to 11 Williston §§ 30:6–7 omitted). Significantly,

neither party in this case asserts that the relevant documents are ambiguous. Pl.'s Opp'n 16 n.3;

Def.'s SJ Mot. 10, 15.

The CBA states that "the Fund's Trust Document [is] incorporated into, and forms part

of, this Agreement." Def.'s SJ Mot., Ex. D ("CBA"), Addendum VII, Section 3 & Article VIII,

Section 15. Within the incorporated Trust Document, there is a provision entitled "Exit

Contribution and Surcharges," which states as follows:

> The Trustees [of the Fund] may, in their sole and absolute
> discretion, impose an "Exit Contribution" (as determined below)
> on any Employer who has a "Triggering Event" on or after January
> 1, 2003. . . . Each Employer agrees to pay an Exit Contribution by
> continuing to contribute, or continuing to be obligated to

> contribute, to the Fund on or after January 1, 2003. . . . *A "Triggering Event" occurs when an Employer's Contribution Rate significantly declines (as determined by the Trustees) or the Employer ceases to have an obligation to contribute to the Fund on some or all of its Employees, but is not required to pay any withdrawal liability under Title IV of ERISA as a result thereof.*

Trust Doc., Article V, Section 6 (emphasis added).

Caddo asserts that the CBA contains a survivability clause "that specifically states which provisions survive," and that the provision incorporating the Trust Document—and consequently, the exit contribution provision—is not among them. Def.'s Opp'n 16. This clause, alternatively referred to as a durational clause, provides that the CBA "shall become effective on the 1st of July, 2010 and remain in full force and effect until the 30th day of June, 2013 . . . ." CBA, Article XVI, Section 1. It then goes on to state that Article X, Section 8—the provision governing arbitration procedures—"shall continue in full force and effect until modified by order of the National Joint Adjustment Board or until the [arbitration] procedures ... have been otherwise completed." *Id.* Caddo maintains that the above language necessarily implies that the arbitration provision is the only provision meant to survive the expiration of the contract.

Caddo also points to an addendum to the CBA obligating it to "contribute" to the Fund "[f]or the duration of this Agreement and any renewals or extensions thereof." CBA, Addendum VII, Section 3(1). Because this provision is nearly identical to the durational clause in *M & G Polymers*, Caddo argues that it should be afforded the same preclusive effect. *Compare M & G Polymers*, 135 S. Ct. at 931 (holding durational clause stating that retiree health benefits would be provided "[e]ffective January 1, 1998, and for the duration of this Agreement thereafter" was dispositive and therefore benefits did not survive expiration of contract), *with* CBA, Addendum VII, Section 3(1) ("For the duration of this Agreement and any renewals or extensions thereof,

6

the Employer will contribute to [the Fund] the negotiated rate . . . ."). When read in conjunction

with the rest of the provision, however, it is apparent that this language pertains to the *monthly*

contributions that are tied to the hours worked by Caddo employees, and says nothing of an exit

contribution:

> For the duration of this Agreement and any renewals or extensions
> thereof, the Employer will contribute to [the Fund] the negotiated
> rate per this Agreement and as required by the Alternative
> Schedule, for each hour or part of an hour for which an Employee
> covered by this Agreement receives the basic hourly wage rate.

*Id.* Nevertheless, *the Fund itself* has analogized the exit contribution throughout its pleadings to

this more typical contribution to avail itself of ERISA sections 515 and 502(g)(2), which require

an employer to pay liquidated damages and attorney's fees if it fails to pay "contributions to a

multiemployer plan ... under the terms of a collectively bargained agreement." 29 U.S.C. §§

1132(g)(2), 1145; *see* Pl.'s Mem. Supp. Summ. J. ("SJ Mot.") 11 (stating that the exit

contribution provision "is enforceable under ERISA Section 515"); *see also* Pl.'s Statement of

Facts ¶¶ 15, 20 (stating that "Caddo was obligated to make contributions to the Fund ... through

June 30, 2013" and that the *"Trust Document provisions governing delinquent contributions*

*apply to delinquent Exit Contribution amounts"*).

Plaintiff counters that "[t]he only way to harmonize the terms of the CBA and the Trust

Document is to recognize the survivability of the Exit Contribution provisions because any other

interpretation would render the Exit Contribution provisions meaningless." Pl.'s Opp'n 15.

Notably, this is the Fund's only argument for why the exit contribution provision, based on the

plain language of the CBA and Trust Document, survives the expiration of the agreement. *Id.* at

13–17. The Fund does not dispute that it can exercise its right to assess the exit contribution

*during* the term of the CBA. Fund Dep. 117:7–9 ("Q: And some triggering events may occur

7

during the term of a CBA? A: Yes."). In fact, the Fund effectively concedes that it has previously sought to assess an exit contribution to an employer prior to the expiration of a CBA by stating that "*[i]n many cases,*" not in *all* or even in *most* cases, "an employer ceases to have an obligation to contribute to the Fund when its [CBA] expires and is not renewed." Pl.'s Opp'n, Ex. B, Greene Decl. ¶ 9 (emphasis added); *see also* Pl.'s Opp'n 16 ("[T]he *most common* 'triggering event' for an Exit Contribution occurs after the employer's [CBA] expires." (emphasis added)). The exit contribution provision undoubtedly envisions scenarios such as when the employer goes out of business or when it lays off "some" employees *during* the term of the CBA.[2] *See* Trust Doc., Article V, Section 6. Even on its face, it contemplates that the Fund might impose the fee during the term of the CBA by stating that a "'Triggering Event' occurs when an Employer's Contribution Rate significantly *declines*" or when "the Employer ceases to have an obligation to contribute to the Fund on *some* ... of its employees." Trust Doc., Article V, Section 6 (emphasis added).

In sum, because it is undisputed that the exit contribution provision can come into play *during* the term of the CBA, it is not "meaningless" if construed not to survive the CBA's expiration. The Supreme Court's decision in *M & G Polymers* bolsters this conclusion. In that case, the Sixth Circuit had reasoned that a durational clause should not be applied to a retiree health benefits provision because most of the unionized workforce would only retire after the contract's term, and thus "the promise would be completely illusory for *many* early retirees under age 62 if the retiree benefits terminated when the contract expired." *M & G Polymers*, 135 S. Ct. at 934 (emphasis added). The Supreme Court unequivocally rejected this rationale as a

---

[2] This is so because Caddo's monthly contribution rate to the Fund is tied to the amount of hours its employees work in a given month. *See* CBA, Addendum VII. For instance, the most recent amount it was required to contribute to the Fund per employee per hour was $5.91. *Id.* at Addendum IX. If some or all employees cease to work, such as during a layoff or if the business shutters, the contribution rate would "significantly decline[]" and/or Caddo would "cease[] to have an obligation to contribute to the Fund . . . ." *See* Trust Doc., Article V, Section 6.

basis on which to find that the benefits survived the expiration of the CBA. *Id.* at 936. So long

as a provision has *some* significance during the term of the agreement, the Supreme Court held it

is by definition not illusory:

> [T]he Court of Appeals misapplied other traditional principles of
> contract law, including the illusory promises doctrine. That
> doctrine instructs courts to avoid constructions of contracts that
> would render promises illusory because such promises cannot
> serve as consideration for a contract. But the Court of Appeals
> construed provisions that admittedly benefited some class of
> retirees as "illusory" merely because they did not equally benefit
> *all* retirees. That interpretation is a contradiction in terms—a
> promise that is "partly" illusory is by definition not illusory. If it
> benefits some class of retirees, then it may serve as consideration
> for the union's promises. And the court's interpretation is
> particularly inappropriate in the context of collective-bargaining
> agreements, which are negotiated on behalf of a broad category of
> individuals and consequently will often include provisions
> inapplicable to some category of employees.

*Id.* (internal citations omitted). Accordingly, like in *M & G Polymers*, Caddo maintains that

"honoring the facial meaning of the Durational Clauses and the Survivability Clause in this case

would not render the 'exit contribution' illusory, it would only mean that that fee could not be

assessed after CBA expiration." Def.'s Reply Br. 6. Indeed, it appears that the Fund could have

assessed the exit contribution for Caddo's non-renewal of the CBA prior to its expiration because

the CBA requires Caddo to give 90 day notice of non-renewal, which it did in this case. With

this advance notice, the Fund could have made its assessment and determined that Caddo

"cease[d] to have an obligation to contribute to the Fund" on June 30, 2013, the last day of the

contract. Instead, the Fund determined that Caddo had effected a complete withdrawal "on or

about July 1, 2013."[3] Stip. Uncontested Facts ¶ 15. Thus, giving effect to the general durational

---

[3] During oral argument, Plaintiff's counsel confirmed the Fund's position that the "Triggering Event" occurred on
July 1, 2013 because that is when the Fund determined that Caddo ceased to have an obligation to contribute to it.

clause providing that the CBA would expire on June 30, 2013, the exit contribution provision, on its face, does not survive the expiration of the CBA.

In light of the above, the Court concludes that there is no genuine issue as to any material fact based on the unambiguous language of the CBA and the Trust Document. Pursuant to the CBA's durational clause, Caddo did not have any contractual obligations[4] to the Fund on July 1, 2013. The Fund is therefore not entitled to recover the exit contribution that it assessed to Caddo as a result of its determination that a "Triggering Event" occurred on July 1, 2013.[5]

## IV.    Conclusion

For the foregoing reasons, and for good cause, Plaintiff's Motion for Summary Judgment will be denied, and Defendant's Motion for Summary Judgment will be granted.

An appropriate Order shall issue.

June ⟨○⟩ 2015

Alexandria, Virginia

/s/

Liam O'Grady
United States District Judge

---

[4] The Court notes the limited exception within the durational clause with respect to the provision governing arbitration procedures, which will "continue in full force and effect until modified by order of the National Joint Adjustment Board or until the [arbitration] procedures … have been otherwise completed." CBA, Article XVI, Section 1.

[5] Caddo alternatively argues that its motion should be granted because the exit contribution provision is an unenforceable penalty. Def.'s SJ Mot. 15–19. It also appears to invoke a fraud in the inducement defense. Def.'s Opp'n ¶¶ 3–23. The Court is not persuaded that either of these defenses applies and therefore declines to grant summary judgment to Caddo on these alternative bases.

10